**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANGEL McCLARY RAICH; JOHN DOE,
Number One; JOHN DOE, Number
Two,
  *Plaintiffs-Appellants,*

  v.

ALBERTO R. GONZALES, Attorney
General, as United States Attorney
General; KAREN TANDY,* as
Administrator of the Drug
Enforcement Administration,
  *Defendants-Appellees.*

No. 03-15481

D.C. No.
CV-02-04872-MJJ

OPINION

Appeal from the United States District Court
for the Northern District of California
Martin J. Jenkins, District Judge, Presiding

Argued and Submitted
March 27, 2006—Pasadena, California

Filed March 14, 2007

Before: Harry Pregerson, C. Arlen Beam,** and
Richard A. Paez, Circuit Judges.

Opinion by Judge Pregerson;
Partial Concurrence and Partial Dissent by Judge Beam

*Karen Tandy is substituted for her predecessor, Asa Hutchinson, as
Administrator of the Drug Enforcement Administration, pursuant to Fed.
R. App. P. 43(c)(2).

**The Honorable C. Arlen Beam, Senior United States Circuit Judge
for the Eighth Circuit, sitting by designation.

3025

## COUNSEL

Robert A. Raich, (briefed) Oakland, California and Randy E. Barnett, (argued) Boston University School of Law, Boston, Massachusetts, for the plaintiffs-appellants.

Mark T. Quinlivan, Assistant United States Attorney, Boston, Massachusetts, for the defendants-appellees.

## OPINION

PREGERSON, Circuit Judge:

Plaintiff-Appellant Angel McClary Raich ("Raich") is a seriously ill individual who uses marijuana for medical purposes on the recommendation of her physician. Such use is permitted under California law. The remaining plaintiffs-appellants assist Raich by growing marijuana for her treatment.

Appellants seek declaratory and injunctive relief based on the alleged unconstitutionality of the Controlled Substances Act, and a declaration that medical necessity precludes enforcement of the Controlled Substances Act against them. On March 5, 2003, the district court denied appellants' motion for a preliminary injunction. We hear this matter on remand following the Supreme Court's decision in *Gonzales v. Raich*, 125 S. Ct. 2195 (2005). For the reasons set forth below, we affirm the district court.

## STATUTORY SCHEMES

### I.  *The Controlled Substances Act*

Congress passed the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, 84 Stat. 1236, to create a comprehensive drug enforcement regime it called the Controlled Substances Act, 21 U.S.C. § 801-971. Congress established five "schedules" of "controlled substances." *See* 21 U.S.C. § 802(6). Controlled substances are placed on a particular schedule based on their potential for abuse, their accepted medical use in treatment, and the physical and psychological consequences of abuse of the substance. *See* 21 U.S.C. § 812(b). Marijuana is a Schedule I controlled substance. 21 U.S.C. § 812(c), Sched. I (c)(10). For a substance to be designated a Schedule I controlled substance, it must be found: (1) that the substance "has a high potential for

abuse"; (2) that the substance "has no currently accepted medical use in treatment in the United States"; and (3) that "[t]here is a lack of accepted safety for use of the drug or other substance under medical supervision." 21 U.S.C. § 812(b)(1). The Controlled Substances Act sets forth procedures by which the schedules may be modified. *See* 21 U.S.C. § 811(a).

Under the Controlled Substances Act, it is unlawful to knowingly or intentionally "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance," except as otherwise provided in the statute. 21 U.S.C. § 841(a)(1). Possession of a controlled substance, except as authorized under the Controlled Substances Act, is also unlawful. *See* 21 U.S.C. § 844(a).

II. *California's Compassionate Use Act of 1996*

California voters passed Proposition 215 in 1996, which is codified as the Compassionate Use Act of 1996 ("Compassionate Use Act"). *See* Cal. Health & Safety Code § 11362.5. The Compassionate Use Act is intended to permit Californians to use marijuana for medical purposes by exempting patients, primary caregivers, and physicians from liability under California's drug laws. The Act explicitly states that its purpose is to

> ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief.

*Id.* § 11362.5(b)(1)(A). Another purpose of the Compassionate Use Act is "[t]o ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction." *Id.* § 11362.5(b)(1)(B). The Compassionate Use Act strives "[t]o encourage the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana." *Id.* § 11362.5(b)(1)(C).

To achieve its goal, the Compassionate Use Act exempts from liability under California's drug laws "a patient, or . . . a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." *Id.* § 11362.5(d).

## FACTUAL & PROCEDURAL HISTORY

Appellant Angel McClary Raich is a Californian who uses marijuana for medical treatment. Raich has been diagnosed with more than ten serious medical conditions, including an inoperable brain tumor, a seizure disorder, life-threatening weight loss, nausea, and several chronic pain disorders. Raich's doctor, Dr. Frank Henry Lucido, testified that he had explored virtually every legal treatment alternative, and that all were either ineffective or resulted in intolerable side effects. Dr. Lucido provided a list of thirty-five medications that were unworkable because of their side effects.

Marijuana, on the other hand, has proven to be of great medical value for Raich. Raich has been using marijuana as a medication for nearly eight years, every two waking hours of every day. Dr. Lucido states that, for Raich, foregoing marijuana treatment may be fatal. As the district court put it, "[t]raditional medicine has utterly failed [Raich]." *Raich v. Ashcroft*, 248 F. Supp. 2d 918, 921 (N.D. Cal. 2003).

Raich is unable to cultivate marijuana for her own use. Instead, Raich's caregivers, John Doe Number One and John Doe Number Two, cultivate it for her. They provide marijuana to Raich free of charge. They have joined this action as plaintiffs anonymously in order to protect Raich's access to medical marijuana.

This action arose in response to a law enforcement raid on the home of another medical marijuana user, former plaintiff-appellant Diane Monson.[1] On August 15, 2002, Butte County Sheriff's Department deputies, the Butte County District Attorney, and agents from the federal Drug Enforcement Agency ("DEA") came to Monson's home. After DEA agents took control of Monson's six marijuana plants, a three-hour standoff between state and federal authorities ensued. The Butte County deputies and district attorney concluded that Monson's use of marijuana was legal under the Compassionate Use Act. The DEA agents, after conferring with the U.S. Attorney for the Eastern District of California, concluded that Monson possessed the plants in violation of federal law. The DEA agents seized and destroyed Monson's six marijuana plants.

Fearing raids in the future and the prospect of being deprived of their medicinal marijuana, Raich, Monson, and the John Doe plaintiffs sued the United States Attorney General and the Administrator of the DEA in federal district court on October 9, 2002. The suit sought declaratory and injunctive relief. Specifically, plaintiffs-appellants argued: (1) that the Controlled Substances Act was unconstitutional as applied to them because the legislation exceeded Congress's Commerce Clause authority; (2) that through the Controlled Substances Act, Congress impermissibly exercised a police power that is reserved to the State of California under the Tenth Amendment; (3) that the Controlled Substances Act unconsti-

---

[1]Plaintiff-Appellant Monson withdrew from this action on December 12, 2005.

tutionally infringed their fundamental rights protected by the Fifth and Ninth Amendments; and (4) that the Controlled Substances Act could not be enforced against them because their allegedly unlawful conduct was justified under the common law doctrine of necessity.

On October 30, 2002, the plaintiffs-appellants moved for a preliminary injunction. On March 4, 2003, the district court denied the motion by a published order. *See Raich v. Ashcroft*, 248 F. Supp. 2d 918. The district court found that, "despite the gravity of plaintiffs' need for medical cannabis, and despite the concrete interest of California to provide it for individuals like them," the appellants had not established the required " 'irreducible minimum' of a likelihood of success on the merits under the law of this Circuit." *Id.* at 931.

On December 16, 2003, we reversed and remanded this matter to the district court to enter a preliminary injunction. *See Raich v. Ashcroft*, 352 F.3d 1222, 1235 (9th Cir. 2003). We held that the plaintiffs-appellants had demonstrated a strong likelihood of success on the merits of their claim that the Controlled Substances Act, as applied to them, exceeded Congress's Commerce Clause authority. *See id.* at 1234. We did not reach plaintiffs-appellants' remaining arguments in favor of the preliminary injunction. *See id.* at 1227. The Government timely petitioned the Supreme Court for a writ of certiorari. The Supreme Court granted certiorari on June 28, 2004. *See Ashcroft v. Raich*, 542 U.S. 936 (2004).

On June 6, 2005, the Supreme Court vacated our opinion and held that Congress's Commerce Clause authority includes the power to prohibit purely intrastate cultivation and use of marijuana. *See Gonzales v. Raich*, 125 S. Ct. at 2215. The Court remanded the case to us to address plaintiffs-appellants's remaining legal theories in support of a preliminary injunction. *See id.* On remand, Raich renews her claims based on common law necessity, fundamental rights protected by the Fifth and Ninth Amendments, and rights reserved to

the states under the Tenth Amendment. She also argues for the first time that the Controlled Substances Act, by its terms, does not prohibit her from possessing and using marijuana if permitted to do so under state law. We have jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(a)(1).

## STANDING & STANDARD OF REVIEW

[1] To satisfy the requirements of constitutional standing, "the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Mujahid v. Daniels*, 413 F.3d 991, 994 (9th Cir. 2005) (citing *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)). Furthermore, the injury must be: (1) concrete and particularlized, and (2) actual or imminent, not conjectural or hypothetical. *See United States v. Antelope*, 395 F.3d 1128, 1132 (9th Cir. 2005).

[2] We are convinced that the requirements of constitutional standing have been met here.[2] Although Raich has not suffered any past injury, she is faced with the threat that the Government will seize her medical marijuana and prosecute her for violations of federal drug law. The threat posed by deprivation of her medical treatment is serious and concrete: Raich's doctor testified that foregoing medical marijuana treatment might be fatal. The threat is not speculative or conjectural: DEA agents previously seized and destroyed the medical marijuana of former plaintiff-appellant Diane Monson. Monson's withdrawal from this action does not change the fact that DEA agents have — and may again — seize and destroy medical marijuana possessed by gravely ill Californians, including Raich. Finally, it is clear that Raich's threatened injury may be fairly traced to the defendants, and that a favorable injunction from this court would redress Raich's threatened injury.

---

[2]We also note that the Supreme Court did not question constitutional standing in this case. *See Gonzales v. Raich*, 125 S. Ct. 2195.

A district court's decision regarding preliminary injunctive relief is subject to limited review. *See Harris v. Bd. of Supervisors*, 366 F.3d 754, 760 (9th Cir. 2004). The court should be reversed only if it abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *See id.* A preliminary injunction must be supported by findings of fact, reviewed for clear error. *See Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1239 (9th Cir. 2001). The district court's conclusions of law are reviewed de novo. *See Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1221 (9th Cir. 2003).

## DISCUSSION

"The standard for granting a preliminary injunction balances the plaintiff's likelihood of success against the relative hardship to the parties." *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003). We have two different criteria for determining whether preliminary injunctive relief is warranted. "Under the traditional criteria, a plaintiff must show (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to [the] plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)." *See Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005) (internal quotations omitted). We also use an alternative test whereby a court may grant the injunction if the plaintiff demonstrates either: (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in his favor. *See id.*

The two alternative formulations "represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. They are not separate tests but rather outer reaches of a single continuum." *Baby Tam & Co. v. City of Las Vegas*, 154 F.3d

1097, 1100 (9th Cir. 1998) (internal quotation marks and citations omitted).

## I.   *Common Law Necessity*

Raich first argues that she has a likelihood of success on the merits of her claim that the common law doctrine of necessity bars the federal government from enforcing the Controlled Substances Act against her medically-necessary use of marijuana.[3] Raich avers that she is faced with a choice of evils: to either obey the Controlled Substances Act and endure excruciating pain and possibly death, or violate the terms of the Controlled Substances Act and obtain relief from her physical suffering.

The necessity defense "traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils" and the actor had no "reasonable, legal alternative to violating the law." *United States v. Bailey*, 444 U.S. 394, 410 (1980); *see also* 2 Wayne R. LaFave, Substantive Criminal Law § 10.1 at 116 (2d ed. 2003 & Supp. 2005). As we have recognized,

> In some sense, the necessity defense allows us to act as individual legislatures, amending a particular criminal provision or crafting a one-time exception to it, subject to court review, when a real legislature would formally do the same under those circumstances. For example, by allowing prisoners who escape a burning jail to claim the justification of necessity, we assume the lawmaker, confronting this problem, would have allowed for an exception to the law proscribing prison escapes.

---

[3]We address Raich's necessity claim before her constitutional substantive due process claim because "an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available." *Gilmore v. California*, 220 F.3d 987, 998 (9th Cir. 2000) (quoting *NLRB v. Catholic Bishop*, 440 U.S. 490, 500 (1979)).

*United States v. Schoon*, 971 F.2d 193, 196-97 (9th Cir. 1991).

The Supreme Court has recognized that a common law necessity defense exists even when a statute does not explicitly include the defense. *See Bailey*, 444 U.S. at 425 (Blackmun, J., dissenting) (having "no difficulty in concluding that Congress intended the defenses of duress and necessity to be available" to prison escape defendant); *id.* at 415 n.11 (Rehnquist, J., majority opinion) (noting that the majority's "principal difference with the dissent, therefore, is not as to the existence of [the necessity] defense but as to the importance of surrender as an element of it").[4]

### A. *Whether Raich Satisfies the Requirements of the Common Law Necessity Defense*[5]

---

[4]Dicta in a recent Supreme Court decision questioned the ongoing vitality of common law necessity defense. The majority in *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 490 (2001) ("*Oakland Cannabis*"), stated that "it is an open question whether federal courts ever have authority to recognize a necessity defense not provided by statute." But the majority ultimately conceded that the "Court ha[d] discussed the possibility of a necessity defense without altogether rejecting it." *Id.* (citing *Bailey*, 444 U.S. at 415). Three Justices filed a separate concurrence in *Oakland Cannabis*, noting that "the Court gratuitously casts doubt on 'whether necessity can ever be a defense' to *any* federal statute that does not explicitly provide for it, calling such a defense into question by a misleading reference to its existence as an 'open question.' " *Id.* at 501 (Stevens, J., concurring) (quoting majority opinion) (emphasis in original). "[O]ur precedent has expressed no doubt about the viability of the common-law defense, even in the context of federal criminal statutes that do not provide for it in so many words." *Id.* (citing *Bailey*, 444 U.S. at 415).

We do not believe that the *Oakland Cannabis* dicta abolishes more than a century of common law necessity jurisprudence. *See, e.g., Regina v. Dudley & Stephens*, 14 Q.B.D. 273 (1884).

[5]As the Supreme Court did in *Oakland Cannabis*, we first address the underlying principles of the common law necessity defense, and then turn to the defense's relationship to the Controlled Substances Act and the relief sought. *See, e.g., Oakland Cannabis*, 532 U.S. at 490-95.

**[3]** Here, although we ultimately conclude that Raich is not entitled to injunctive relief on the basis of her common law necessity claim, we briefly note that, in light of the compelling facts before the district court, Raich appears to satisfy the threshold requirements for asserting a necessity defense under our case law. We have set forth the following general standards for a necessity defense:

> As a matter of law, a defendant must establish the existence of four elements to be entitled to a necessity defense: (1) that he was faced with a choice of evils and chose the lesser evil; (2) that he acted to prevent imminent harm; (3) that he reasonably anticipated a causal relation between his conduct and the harm to be avoided; and (4) that there were no other legal alternatives to violating the law.

*United States v. Aguilar*, 883 F.2d 662, 693 (9th Cir. 1989).

We first ask whether Raich was faced with a choice of evils and whether she chose the lesser evil. Raich's physician presented uncontroverted evidence that Raich "cannot be without cannabis as medicine" because she would quickly suffer "precipitous medical deterioration" and "could very well" die. If Raich obeys the Controlled Substances Act she will have to endure intolerable pain including severe chronic pain in her face and jaw muscles due to temporomandibular joint dysfunction and bruxism, severe chronic pain and chronic burning from fibromyalgia that forces her to be flat on her back for days, excruciating pain from non-epileptic seizures, heavy bleeding and severely painful menstrual periods due to a uterine fibroid tumor, and acute weight loss resulting possibly in death due to a life-threatening wasting disorder.[6] Alterna-

---

[6]This litany of ailments makes no mention of the fact that Raich was confined to a wheelchair before she found effective pain management in marijuana, which restored her ability to walk. The seriousness of her conditions cannot be overemphasized: in 1997, the extreme physical and psy-

tively, Raich can violate the Controlled Substances Act and avoid the bulk of those debilitating pains by using marijuana. The evidence persuasively demonstrates that, in light of her medical condition, Raich satisfies the first prong of the necessity defense.

[4] We next ask whether Raich is acting to prevent imminent harm. All medical evidence in the record suggests that, if Raich were to stop using marijuana, the acute chronic pain and wasting disorders would immediately resume. The Government does not dispute the severity of her conditions or the likelihood that her pain would recur if she is deprived of marijuana. Raich has therefore established that the harm she faces is imminent.

[5] Prong three asks whether Raich reasonably anticipated a causal connection between her unlawful conduct and the harm to be avoided. We believe that Raich's belief in the causal connection is reasonable. Here, Raich's licensed physician testified to the causal connection between her physical condition and her need to use marijuana. The Government did not dispute this medical evidence. Because Raich has clearly demonstrated the medical correlation, she has satisfied prong three.[7]

---

chological pain led Raich to attempt suicide. We are mindful that "extreme pain totally occupies the psychic world" and that "in serious pain the claims of the body utterly nullify the claims of the world." Seth F. Kreimer, *The Second Time as Tragedy: The Assisted Suicide Cases and the Heritage of* Roe v. Wade, 24 Hastings Const. L.Q. 863, 895 & n.157 (1997) (citations omitted). Raich has shown remarkable fortitude in pursuing this action to vindicate the rights of the infirm despite her precarious physical condition.

[7]The causal connection prong limits the danger that a medical necessity exception could open the floodgates to widespread exceptions to the Controlled Substances Act. A marijuana "necessity" claimant absolutely must present, as Raich has, testimony that the allegedly unlawful action was taken at the direction of a doctor.

**[6]** Finally, we ask whether Raich had any legal alternatives to violating the law. Dr. Lucido's testimony makes clear that Raich had no legal alternatives: Raich "has tried essentially all other legal alternatives to cannabis and the alternatives have been ineffective or result in intolerable side effects." Raich's physician explained that the intolerable side effects included violent nausea, shakes, itching, rapid heart palpitations, and insomnia. We agree that Raich does not appear to have any legal alternative to marijuana use.[8]

**[7]** Although Raich appears to satisfy the factual predicate for a necessity defense, it is not clear whether the Supreme Court's decision in *United States v. Oakland Cannabis Buyers' Cooperative* forecloses a necessity defense to a prosecution of a seriously ill defendant under the Controlled Substances Act. 532 U.S. 483, 484 n.7 (2001). Similarly, whether the Controlled Substances Act encompasses a legislative "determination of values," *id.* at 491, that would preclude a necessity defense is also an unanswered question. These are difficult issues, and in light of our conclusion below that Raich's necessity claim is best resolved within the context of a specific prosecution under the Controlled Substances Act, where the issue would be fully joined, we do not attempt to answer them here.

---

[8]The Government suggests that certain federal programs exist which might allow Raich to obtain marijuana lawfully. *See*, *e.g.*, 21 U.S.C. § 823(f) (authorizing the Secretary of Health and Human Services to permit medical practitioners to design and implement research protocols using Schedule I substances, including marijuana, on a case-by-base basis). Amici curiae American Civil Liberties Union Foundation and Marijuana Policy Project and Rick Doblin, Ph.D make abundantly clear that this is not a tenable "alternative." The program is highly restricted and has not accepted new medical marijuana patients since 1992.

B. *Whether a Viable Necessity Defense Gives Raich a Likelihood of Success on the Merits on this Action for Injunctive Relief*

Irrespective of the compelling factual basis for Raich's necessity claim, whether Raich has a likelihood of success on the merits in this action for injunctive relief is a different question. We conclude that Raich has not demonstrated that she will likely succeed in obtaining injunctive relief on the necessity ground.

[8] The necessity defense is an affirmative defense that removes criminal liability for violation of a criminal statute. *See* 2 LaFave, Substantive Criminal Law § 9.1(a) (2d ed. 2003 & Supp. 2005). Necessity is essentially a justification for the prohibited conduct: the "harm caused by the justified behavior remains a legally recognized harm that is to be avoided whenever possible." Paul H. Robinson, Criminal Law Defenses § 24(a) (1984 & Supp. 2006-2007). A common law necessity defense thus singles out conduct that is "otherwise criminal, which under the circumstances is socially acceptable and which deserves neither criminal liability nor even censure." LaFave, Substantive Criminal Law § 9.1(a)(3) (2d ed. 2003 & Supp. 2005) (quotation omitted). The necessity defense serves to protect the defendant from criminal liability.

[9] Though a necessity defense may be available in the context of a criminal prosecution, it does not follow that a court should prospectively enjoin enforcement of a statute. Raich's violation of the Controlled Substances Act is a legally recognized harm, but the necessity defense shields Raich from liability for criminal prosecution during such time as she satisfies the defense. Thus, if Raich were to make a miraculous recovery that obviated her need for medical marijuana, her necessity-based justification defense would no longer exist. Similarly, if Dr. Lucido found an alternative treatment that did not violate the law — a legal alternative to violating the Controlled Substances Act — Raich could no longer

assert a necessity defense. That is to say, a necessity defense is best considered in the context of a concrete case where a statute is allegedly violated, and a specific prosecution results from the violation. Indeed, oversight and enforcement of a necessity defense-based injunction would prove impracticable: the ongoing vitality of the injunction could hinge on factors including Raich's medical condition or advances in lawful medical technology. Nothing in the common law or our cases suggests that the existence of a necessity defense empowers this court to enjoin the enforcement of the Controlled Substances Act as to one defendant.

[10] Because common law necessity prevents criminal liability, but does not permit us to enjoin prosecution for what remains a legally recognized harm, we hold that Raich has not shown a likelihood of success on the merits on her medical necessity claim for an injunction.[9]

## II. *Substantive Due Process*

Raich contends that the district court erred by failing to protect her fundamental rights. Her argument focuses on unenumerated rights protected by the Fifth and Ninth Amendments to the Constitution under a theory of substantive due process.[10]

---

[9]We cannot ignore that the unusual circumstances of this case raise the danger of acute preconviction harms. The arrest of Raich or her suppliers, or the confiscation of her medical marijuana would cause Raich severe physical trauma. Under the right circumstances, Raich might obtain relief from the courts for preconviction harm based on common law necessity. *See generally Jones v. County of Los Angeles*, 444 F.3d 1118, 1129-31 (9th Cir. 2006) (noting that constitutionally cognizable harm can occur "at arrest, at citation, or even earlier," and criticizing the government's position that "would allow the state to criminalize a protected behavior or condition and cite, arrest, jail, and even prosecute individuals for violations, so long as no conviction resulted").

[10]We refer to these claims together as the substantive due process claim.

A.    *Substantive Due Process, Generally*

**[11]** Although the Fifth Amendment's Due Process Clause states only that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law," *see* U.S. Const. amend. V, it unquestionably provides substantive protections for certain unenumerated fundamental rights.[11] "The Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997); *see also Planned Parenthood of S.E. Penn. v. Casey*, 505 U.S. 833, 847 (1992) ("It is tempting, as a means of curbing the discretion of federal judges, to suppose that liberty encompasses no more than those rights already guaranteed to the individual against federal interference by the express provisions of the first eight Amendments to the Constitution. But of course this Court has never accepted that view." (internal citation omitted)). As Justice Harlan put it over forty years ago:

> [T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This 'liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly

---

[11]Although the Fifth Amendment's Due Process Clause is applicable here, cases finding substantive rights under the Fourteenth Amendment's Due Process Clause are equally relevant. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("We have long recognized that the Amendment's Due Process Clause, *like its Fifth Amendment counterpart*, guarantees more than fair process. The Clause also includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests." (emphasis added) (internal citation and quotation marks omitted)).

speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment.

*Poe v. Ullman*, 367 U.S. 497, 543 (1961) (Harlan, J., dissenting) (citations omitted); *see also Casey*, 505 U.S. at 849 (noting that Justice Harlan's position was adopted by the Court in *Griswold v. Connecticut*, 381 U.S. 479 (1965)). These contentions find support in the Ninth Amendment, which provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX.

In *Glucksberg*, the Supreme Court set forth the two elements of the substantive due process analysis.

First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, "deeply rooted in this Nation's history and tradition," and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed." Second, we have required in substantive-due-process cases a "careful description" of the asserted fundamental liberty interest.

*Glucksberg*, 521 U.S. at 720-21 (citations omitted).

The Supreme Court has a long history of recognizing unenumerated fundamental rights as protected by substantive due process, even before the term evolved into its modern usage. *See, e.g., Casey*, 505 U.S. 833 (to have an abortion); *Roe v. Wade*, 410 U.S. 113 (1973) (same); *Eisenstadt v. Baird*, 405 U.S. 438 (1972) (to use contraception); *Griswold*, 381 U.S. 479 (to use contraception, to marital privacy); *Lov-*

*ing v. Virginia*, 388 U.S. 1 (1967) (to marry); *Rochin v. California*, 342 U.S. 165 (1952) (to bodily integrity); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942) (to have children); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) (to direct the education and upbringing of one's children); *Meyer v. Nebraska*, 262 U.S. 390 (1923) (same). But the Court has cautioned against the doctrine's expansion. *See Glucksberg*, 521 U.S. at 720 (stating that the Court must restrain the expansion of substantive due process "because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended" and because judicial extension of constitutional protection for an asserted substantive due process right "place[s] the matter outside the arena of public debate and legislative action" (citations omitted)); *Reno v. Flores*, 507 U.S. 292, 302 (1993) (noting that "[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field" (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992))).

Bearing that rubric in mind, we consider Raich's substantive due process claim. In the present case, it is helpful to begin with the second step — the description of the asserted fundamental right — before determining whether the right is deeply rooted in this nation's history and traditions and implicit in the concept of ordered liberty.

## B.  *Breadth of the Fundamental Right*

[12] *Glucksberg* instructs courts to adopt a narrow definition of the interest at stake. *See* 521 U.S. at 722 ("[W]e have a tradition of carefully formulating the interest at stake in substantive-due-process cases."); *see also Flores*, 507 U.S. at 302 (noting that the asserted liberty interest must be construed narrowly to avoid unintended consequences). Substantive due process requires a "careful description of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721 (quotation and citations omitted).

*Glucksberg* involved a substantive due process challenge to Washington state's ban on assisted suicide. *See id.* at 705-06. The Court in *Glucksberg* rejected the suggestion that the interest at stake was the "right to die" or "the right to choose a humane, dignified death," and instead held that the narrow question before the Court was "whether the 'liberty' specially protected by the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so." *Id.* at 722-23.

Another case that considered and rejected several asserted fundamental rights involved unaccompanied alien juveniles who are in the custody of immigration authorities. *See Flores*, 507 U.S. at 294. The *Flores* Court rejected the proposed fundamental right of "freedom from physical restraint" because it was not an accurate depiction of the true issue in the case. *See Flores*, 507 U.S. at 302. The Court also rejected the formulation of the "right of a child to be released from all other custody into the custody of its parents, legal guardian, or even close relatives." *Id.* Instead, the *Flores* Court examined the narrow "right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution." *Id.*; *see also Lawrence v. Texas*, 539 U.S. 558, 578 (2003) (recognizing narrowly defined fundamental right to engage in consensual sexual activity, including homosexual sodomy, in the home without government intrusion).

## C.   *Raich's Asserted Fundamental Interest*

Raich asserts that she has a fundamental right to "mak[e] life-shaping medical decisions that are necessary to preserve the integrity of her body, avoid intolerable physical pain, and preserve her life." We note that Raich's carefully crafted interest comprises several fundamental rights that have been recognized at least in part by the Supreme Court. *See Law-*

*rence*, 539 U.S. at 574 (recognizing that "the Constitution demands [respect] for the autonomy of the person in making [personal] choices"); *Casey*, 505 U.S. at 849 (noting importance of protecting "bodily integrity"); *id.* at 852 (observing that a woman's "suffering is too intimate and personal" for government to compel such suffering by requiring woman to carry a pregnancy to term).

Yet, Raich's careful statement does not narrowly and accurately reflect the right that she seeks to vindicate. Conspicuously missing from Raich's asserted fundamental right is its centerpiece: that she seeks the right to use *marijuana* to preserve bodily integrity, avoid pain, and preserve her life.[12] As in *Glucksberg*, *Flores*, and *Cruzan*, the right must be carefully stated and narrowly identified before the ensuing analysis can proceed. Accordingly, we will add the centerpiece — the use of marijuana — to Raich's proposed right.[13]

**[13]** Accordingly, the question becomes whether the liberty interest specially protected by the Due Process Clause embraces a right to make a life-shaping decision on a physician's advice to use medical marijuana to preserve bodily integrity, avoid intolerable pain, and preserve life, when all other prescribed medications and remedies have failed.

D.   *Whether the Asserted Right is "Deeply Rooted in This*

---

[12]This degree of specificity is required. In *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261 (1990), the Court declined to frame the right as an unqualified right to die, and instead specifically construed the right as a "constitutionally protected right to refuse lifesaving hydration and nutrition." *Id.* at 279.

[13]We also find persuasive the suggestion of amicus curiae California Medical Association and California Nurses Association: that the definition incorporate reference to the fact that Raich seeks to establish this right "on a physician's advice." We also think that resort to a Schedule I substance should be a last resort, and therefore narrow the right by limiting it to circumstances "when all other prescribed medications have failed."

*Nation's History and Tradition" and "Implicit in the Concept of Ordered Liberty"*

We turn to whether the asserted right is "deeply rooted in this Nation's history and tradition," and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 720-21.

**[14]** It is beyond dispute that marijuana has a long history of use — medically and otherwise — in this country. Marijuana was not regulated under federal law until Congress passed the Marihuana Tax Act of 1937, Pub. L. No. 75-348, 50 Stat. 551 (repealed 1970), and marijuana was not prohibited under federal law until Congress passed the Controlled Substances Act in 1970. *See Gonzales v. Raich*, 125 S. Ct. at 2202. There is considerable evidence that efforts to regulate marijuana use in the early-twentieth century targeted recreational use, but permitted medical use. *See* Richard J. Bonnie & Charles H. Whitebread, *The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition*, 56 Va. L. Rev. 971, 1010, 1027, 1167 (1970) (noting that all twenty-two states that had prohibited marijuana by the 1930s created exceptions for medical purposes). By 1965, although possession of marijuana was a crime in all fifty states, almost all states had created exceptions for "persons for whom the drug had been prescribed or to whom it had been given by an authorized medical person." *Leary v. United States*, 395 U.S. 6, 16-17 (1969).

**[15]** The history of medical marijuana use in this country took an about-face with the passage of the Controlled Substances Act in 1970. Congress placed marijuana on Schedule I of the Controlled Substances Act, taking it outside of the realm of all uses, including medical, under federal law. As the Supreme Court noted in *Gonzales v. Raich*, 125 S. Ct. at 2199, no state permitted medical marijuana usage until California's Compassionate Use Act of 1996. Thus, from 1970 to

1996, the possession or use of marijuana — medically or otherwise — was proscribed under state and federal law.[14]

Raich argues that the last ten years have been characterized by an emerging awareness of marijuana's medical value. She contends that the rising number of states that have passed laws that permit medical use of marijuana or recognize its therapeutic value is additional evidence that the right is fundamental. Raich avers that the asserted right in this case should be protected on the "emerging awareness" model that the Supreme Court used in *Lawrence v. Texas*, 539 U.S. at 571.

The *Lawrence* Court noted that, when the Court had decided *Bowers v. Hardwick*, 478 U.S. 186 (1986), "[twenty-four] States and the District of Columbia had sodomy laws." *Lawrence*, 539 U.S. at 572. By the time a similar challenge to sodomy laws arose in *Lawrence* in 2004, only thirteen states had maintained their sodomy laws, and there was a noted "pattern of nonenforcement." *Id.* at 573. The Court observed that "times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress." *Id.* at 579.

Though the *Lawrence* framework might certainly apply to the instant case, the use of medical marijuana has not obtained the degree of recognition today that private sexual conduct had obtained by 2004 in *Lawrence*. Since 1996, ten states other than California have passed laws decriminalizing in varying degrees the use, possession, manufacture, and distribution of marijuana for the seriously ill. *See* Alaska Stat. § 11.71.090; Colo. Rev. Stat. § 18-18-406.3; Haw. Rev. Stat. § 329-125; Me. Rev. Stat. Ann. tit. 22, § 2383-B; Mont. Code

---

[14]The mere enactment of a law, state or federal, that prohibits certain behavior does not necessarily mean that the behavior is not deeply rooted in this country's history and traditions. It is noteworthy, however, that over twenty-five years went by before any state enacted a law to protect the alleged right.

Ann. § 50-46-201; Nev. Rev. Stat. § 453A.200; Or. Rev. Stat. § 475.319; R.I. Gen. Laws § 21-28.6-4; Vt. Stat. Ann. tit. 18, § 4474b; Wash. Rev. Code § 69.51A.040. Other states have passed resolutions recognizing that marijuana may have therapeutic value, and yet others have permitted limited use through closely monitored experimental treatment programs.[15]

[16] We agree with Raich that medical and conventional wisdom that recognizes the use of marijuana for medical purposes is gaining traction in the law as well. But that legal recognition has not yet reached the point where a conclusion can be drawn that the right to use medical marijuana is "fundamental" and "implicit in the concept of ordered liberty." *See Glucksberg*, 521 U.S. at 720-21 (citations omitted). For the time being, this issue remains in "the arena of public debate and legislative action." *Id.* at 720; *see also Gonzales v. Raich*, 125 S. Ct. at 2215.

[17] As stated above, Justice Anthony Kennedy told us that "times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress." *Lawrence*, 539 U.S. at 579. For now, federal law is blind to the wisdom of a future day when the right to use medical marijuana to alleviate excruciating pain may be deemed fundamental. Although that day has not yet dawned, considering that during the last ten years eleven states have legalized the use of medical marijuana, that day may be upon us sooner than expected. Until that day arrives, federal law does not recognize a fundamental right to use medical mari-

---

[15]While these lesser endorsements of medical marijuana are relevant, they cannot carry the same weight as legislative enactments that fully decriminalize the use of medical marijuana. As the *Lawrence* Court considered the number of states that retained laws that prohibited sodomy, so too must we consider the number of states that continue to prohibit medical marijuana.

juana prescribed by a licensed physician to alleviate excruciating pain and human suffering.[16]

III.  *Tenth Amendment*

Third, Raich contends that the Controlled Substances Act infringes upon the sovereign powers of the State of California, most notably the police powers, as conferred by the Tenth Amendment. The district court found that, as a valid exercise of Congress's Commerce Clause powers, the Controlled Substances Act could curtail the states' exercise of their police powers without violating the Tenth Amendment. *See Raich v. Ashcroft*, 248 F. Supp. 2d at 927. The district court further held that the Controlled Substances Act regulates individual behavior and does not force the state to take any action. *Id.*

[18] The Tenth Amendment reads, in its entirety: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Police power is unquestionably an area of traditional state control.

> Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens. Because these are primarily, and historically, . . . matter[s] of local concern, the

---

[16]Because we find no fundamental right here, we do not address whether any law that limits that right is narrowly drawn to serve a compelling state interest. *See Flores*, 507 U.S. at 301-02. We note, however, that, a recent Supreme Court case suggests that the Controlled Substances Act is not narrowly drawn when fundamental rights are concerned. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 126 S. Ct. 1211, 1221-23 (Feb. 21, 2006) (observing that "mere invocation of the general characteristics of Schedule I substances, as set forth in the Controlled Substances Act, cannot carry the day," and that the government had presented no evidence that narrow exceptions to the Schedule I prohibitions would undercut the government's ability to effectively enforce the Controlled Substances Act).

> States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.

*Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (internal citations and quotation marks omitted). The Compassionate Use Act, aimed at providing for the health of the state's citizens, appears to fall squarely within the general rubric of the state's police powers.

Generally speaking, however, a power granted to Congress trumps a competing claim based on a state's police powers. "The Court long ago rejected the suggestion that Congress invades areas reserved to the States by the Tenth Amendment simply because it exercises its authority under the Commerce Clause in a manner that displaces the States' exercise of their police powers." *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981); *see also United States v. Jones*, 231 F.3d 508, 515 (9th Cir. 2000) ("We have held that if Congress acts under one of its enumerated powers, there can be no violation of the Tenth Amendment.").

**[19]** The Supreme Court held in *Gonzales v. Raich* that Congress acted within the bounds of its Commerce Clause authority when it criminalized the purely intrastate manufacture, distribution, or possession of marijuana in the Controlled Substances Act. *See* 125 S. Ct. at 2215. Thus, after *Gonzales v. Raich*, it would seem that there can be no Tenth Amendment violation in this case. Raich concedes that recent Supreme Court decisions have largely foreclosed her Tenth Amendment claim, and she also concedes that this case does not implicate the "commandeering" line of cases.[17]

---

[17]The commandeering cases involve attempts by Congress to direct states to perform certain functions, command state officers to administer federal regulatory programs, or to compel states to adopt specific legislation. *See, e.g., Printz v. United States*, 521 U.S. 898, 935 (1997); *New*

The Supreme Court's recent decision in *Oregon v. Gonzales*, 126 S. Ct. 904 (Jan. 17, 2006) is not to the contrary. In that case, the Court invalidated an Interpretive Rule issued by the Attorney General on the basis of statutory construction, not on the basis of constitutional invalidity under the Tenth Amendment. *See id.* at 925. Because the Attorney General's Rule was "incongruous with the *statutory* purposes and design" of the Controlled Substances Act, the Rule had to be nullified. *Id.* at 921 (emphasis added). Although *Oregon v. Gonzales* undoubtedly implicates federalism issues, its holding is inapposite to Raich's Tenth Amendment claim.

**[20]** We hold that Raich failed to demonstrate a likelihood of success on her claim that the Controlled Substances Act violates the Tenth Amendment. Accordingly, the district court did not abuse its discretion in denying Raich's motion for preliminary injunction on that basis.

## IV. *The Controlled Substances Act, By Its Terms*

Finally, Raich argues that the plain text of the Controlled Substances Act does not prohibit her from possessing marijuana pursuant to a doctor's order. She observes that the Controlled Substances Act prohibits possession of a controlled substance "unless such substance was obtained . . . pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice." 21 U.S.C. § 844(a). The Controlled Substances Act defines "practitioner" as "a physician . . . licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he practices . . . to distribute, dispense, [or] administer . . . a con-

---

*York v. United States*, 505 U.S. 144, 166 (1992). The Controlled Substances Act, by contrast, "does not require the [state legislature] to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals." *Reno v. Condon*, 528 U.S. 141, 151 (2000).

trolled substance in the course of professional practice." *Id.* § 802(21). Raich contends that her doctor is a licensed physician who may, in the jurisdiction in which he practices, administer controlled substances, including marijuana under the Compassionate Use Act, pursuant to a valid prescription. Accordingly, she argues that her possession of marijuana is legal under the Controlled Substances Act.

**[21]** Raich raises this argument for the first time in her opening brief to our second review of her case. It is a long-standing rule in the Ninth Circuit that, generally, "we will not consider arguments that are raised for the first time on appeal." *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999). That rule is subject to the exceptions that we may consider a new issue if: (1) there are exceptional circumstances why the issue was not raised in the trial court; (2) the new issue arises while the appeal is pending because of a change in the law; or (3) the issue presented is a pure question of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court. *See United States v. Carlson*, 900 F.2d 1346, 1349 (9th Cir. 1990).

Raich does not address the waiver issue in her opening brief, nor does she cite any relevant exception that might apply to her argument. We observe that there do not appear to be any exceptional circumstances concerning why Raich did not raise the argument below, and that there has been no change in the law relevant to this argument. Thus, Raich's only argument against waiver of this claim is that it is a purely legal question, and that the Government will suffer no prejudice as a result of Raich's failure to raise the issue below.[18]

---

[18]We assess prejudice to a party by asking whether the party is in a different position than it would have been absent the alleged deficiency. *See Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). The rule "serves to ensure that legal arguments are considered with the benefit of a fully developed factual record, offers appellate courts the benefit of the district court's prior analysis, and prevents parties from sand-

Even if a case falls within one of the exceptions to waiver enunciated in *Carlson*, we must "still decide whether the particular circumstances of the case overcome our presumption against hearing new arguments." *Dream Palace*, 384 F.3d at 1005. Although Raich's Controlled Substances Act claim appears to fall within the third exception, we conclude that this claim is waived because of the "particular circumstances" surrounding the claim.

**[22]** Raich failed to raise this claim before the district court and before this court in her appeal in *Raich v. Ashcroft*, 352 F.3d 1222. Furthermore, when we requested renewed briefing for this appeal by our order of September 6, 2005, we directed the parties to brief the "remaining claims for declaratory and injunctive relief on the basis of the Tenth Amendment, the Fifth and Ninth Amendments, and the doctrine of medical necessity, as set forth in their complaint." *Raich v. Gonzales*, No. 03-15481 (9th Cir. Sept. 6, 2005) (order directing renewed briefing). Because Raich did not raise this issue below, and because our order instructed the parties to brief only the three claims set forth above, we hold that Raich's claim based on the plain language of the Controlled Substances Act is waived. We express no opinion as to the merits of that claim.

## CONCLUSION

We conclude that Raich has not demonstrated a likelihood of success on the merits of her action for injunctive relief. First, we hold that Raich's common law necessity defense is not foreclosed by *Oakland Cannabis* or the Controlled Sub-

---

bagging their opponents with new arguments on appeal." *Dream Palace v. County of Maricopa*, 384 F.3d 990, 1005 (9th Cir. 2004). It does not appear that the Government has suffered any prejudice from Raich's failure to raise this claim below: the Government is in the same position that it would have otherwise been.

stances Act, but that the necessity defense does not provide a proper basis for injunctive relief. Second, although changes in state law reveal a clear trend towards the protection of medical marijuana use, we hold that the asserted right has not yet gained the traction on a national scale to be deemed fundamental. Third, we hold that the Controlled Substances Act, a valid exercise of Congress's commerce power, does not violate the Tenth Amendment. Finally, we decline to reach Raich's argument that the Controlled Substances Act, by its terms, does not prohibit her possession and use of marijuana because this argument was not raised below.

Accordingly, the judgment of the district court is **AFFIRMED**.

---

BEAM, Circuit Judge, concurring and dissenting:

I concur in the result reached by the court in this case, more particularly its holding that "Raich has not demonstrated a likelihood of success on the merits of her action for injunctive relief" and that the district court's denial of an injunction should be affirmed. I dissent from the court's expansive consideration of the doctrine of common law necessity as well as from several of the factual findings and legal conclusions applied to this issue and other claims before the court.

### DISCUSSION

We should decide only the case that is properly before us, not any other, and we should leave for another day any claim or issue not ripe for consideration. When we do otherwise, we simply create obitur dictum. *See, e.g.*, *Carey v. Musladin*, 127 S. Ct. 649, 655 (2006) (Stevens, J., concurring) (citing *Sheet Metal Workers v. EEOC*, 478 U.S. 421, 490 (1986)).

This case returns to us on remand from the Supreme Court. But, the party that earlier supplied jurisdiction to the Supreme

Court and to this court, Diane Monson, has withdrawn. *Ante* at 3033 n.1. Thus, the facts concerning Ms. Monson generously recited by the court are in no way relevant or material to the issues now raised by Raich. Accordingly, the court likely has no jurisdiction over any claim asserted by the plaintiffs in this appeal but most certainly no jurisdiction to decide whether Raich may assert the doctrine of common law necessity in a future criminal prosecution.

At oral argument, counsel for the parties conceded that there is not now pending nor has there ever been pending a prosecution or even a threatened prosecution of Raich for possession or use of personal amounts of medicinal marijuana. Indeed, counsel for Raich acknowledged at oral argument that, to his knowledge, there has never been a federal criminal prosecution for simple possession or use of medicinal marijuana against anyone anywhere in California. Counsel for the government likewise indicated a lack of knowledge of any such prosecution and stated that it would be "incredibly unlikely" that any such federal prosecution would ensue in the future. So, the court's statement, *ante* at 3035, that "[a]lthough Raich has not suffered any past injury, she is faced with the threat that the Government will seize her medical marijuana and prosecute her for violations of federal drug law" is plainly not supported by the record.

Accordingly, I return to the issues of standing, ripeness and justiciability advanced in my earlier dissent in this case. With specific regard to the court's lengthy discussion of and rulings upon the doctrine of common law necessity, it is clear that

> "[W]here it is impossible to know whether a party will ever be found to have violated a statute, or how, if such a violation is found, those charged with enforcing the statute will respond, any challenge to that statute is premature." *Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 986 (9th Cir. 1991). To satisfy Article III's standing requirements,

a plaintiff must show that she has suffered a concrete and particularized injury in fact that is actual or imminent (not conjectural or hypothetical). Plaintiff must also show that the injury is fairly traceable to the challenged action of the defendant and that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Citizens for Better Forestry v. United States Dep't of Agric.*, 341 F.3d 961, 969 (9th Cir. 2003).

*Raich v. Ashcroft*, 352 F.3d 1222, 1235-36 (9th Cir. 2003) (Beam, J., dissenting).

Here, as to Raich, there is no discrete, challenged action from which an injury can fairly be traced. *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121, 1127 (9th Cir. 1996), requires Raich to show a specific threat of prosecution, and she bears the burden of establishing that the statute in question is actually being enforced. A specific warning of prosecution may suffice, but "a general threat of prosecution is not enough to confer standing." *Id.* Accordingly, the applicability, or not, of the doctrine of common law necessity is not a justiciable issue on this record and Raich currently has no standing to ask the court to consider the matter.

Assuming for purposes of discussion that the bare question of the viability of the doctrine is before us, I nonetheless respectfully disagree with substantial portions of the court's analysis of the matter.

The doctrine of common law (medical) necessity is an affirmative defense assertable only in a criminal prosecution. *E.g.*, *United States v. Arellano-Rivera*, 244 F.3d 1119, 1125-26 (9th Cir. 2001) (holding that "before a *defendant* may present evidence of a necessity defense, his offer of proof must establish that a reasonable jury could" ascertain all the elements of the defense) (emphasis added). After reference to several measures of potential injury and harm to Raich almost

totally unrelated to a reasonably foreseeable criminal prosecution, the court ultimately recognizes the legal limitations of the defense, but only after issuing what amounts to a lengthy advisory opinion.

Here we are engaged in the review of a civil proceeding seeking declaratory relief and injunction, not a criminal adjudication. It is important to note that, contrary to the inference of the court in its factual dissertation, there has been no "testimony" in this case directly addressing the elements of this defense. The evidentiary record, such as it is, was developed in the district court through a request for a preliminary injunction under Rule 65 of the Federal Rules of *Civil* Procedure. All facts recited by the court, some of which are admittedly testimonial in nature, arise from written "declarations" provided by Raich, Monson, Dr. Lucido and Dr. Rose, Monson's physician, in support of the injunction request. Yet, every case cited by the court concerning the viability of the doctrine and its elements involves a criminal prosecution.[1] The burden of proof of such a defense lies with the defendant and involves the following elements:

> As a matter of law, a defendant must establish the existence of four elements to be entitled to a necessity defense: (1) that he was faced with a choice of evils and chose the lesser evil; (2) that he acted to prevent imminent harm; (3) that he reasonably anticipated a causal relation between his conduct and the harm to be avoided; and (4) that there were no other legal alternatives to violating the law.

*United States v. Aguilar*, 883 F.2d 662, 693 (9th Cir. 1989).

---

[1]*See, e.g.*, *United States v. Bailey*, 444 U.S. 394 (1980) (discussing the choice of two evils doctrine); *United States v. Schoon*, 971 F.2d 193 (9th Cir. 1991) (giving the burning jail example); *United States v. Aguilar*, 883 F.2d 662 (9th Cir. 1989) (explaining the standards and elements of the necessity defense).

In this civil action, Raich is not presently in a posture to address elements one, two and three and cannot establish element four. She has not been faced with a "choice of evils," one of which could lead to a criminal prosecution. Nor has she acted to prevent "imminent harm." She has presented no evidence of a tested, adversarial nature sufficient to establish the causal relationship required by element three. And, she has not established and probably cannot establish that she has no legal alternative to violating the law.

The court states that "Raich's physician [Dr. Frank Lucido] presented uncontroverted evidence that Raich 'cannot be without *cannabis* as medicine' because she would quickly suffer 'precipitous medical deterioration' and 'could very well' die." *Ante* at 3039 (emphasis added). This opinion evidence is, of course, gleaned from a written declaration seeking declaratory and injunctive relief while positing a very speculative happenstance. The opinion is not the fruit of an adversarial hearing involving the assertion of an affirmative defense by a criminal defendant in a criminal prosecution designed to test the admissibility and credibility of the proposed evidence. But even if Raich "cannot be without cannabis as medicine," as Dr. Lucido opines, cannabis (or its synthetic equivalent) as medicine is lawfully available to Raich through the prescription-dispensed drug Marinol.[2] And, newly crafted or presently existing drugs as yet untested by Raich may become known or available prior to any prosecution. So Raich may well have a legal alternative to the violation of the drug control laws.

I also cannot fully join the court's analysis of *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483 (2001), as set forth in its footnote 4. *Ante* at 3038. Although

---

[2]The active ingredient in Marinol is synthetic delta-9-tetrahydrocannabinol, a naturally occurring component of Cannabis sativa L, the marijuana Raich says she now consumes. Physicians' Desk Reference, 61st ed., 2007 at 3333.

I do not concede that the Supreme Court's discussion in *Oakland Cannabis* is dicta, I do agree with the court's conclusion that the case does not abolish "common law necessity jurisprudence."

Thus, while I do not concur in the court's statement that "Raich appears to satisfy the threshold requirements for asserting a necessity defense under our case law," *ante* at 3039, I do acknowledge that she certainly *may* be eligible to advance such a defense to criminal liability in the context of an actual prosecution.

Finally, if I fully understand the majority's approach, the most troubling aspect of its opinion is that it purports to let this court determine, on the evidence presented to the district court at the Rule 65 hearing, that Raich, and anyone similarly situated, is entitled to a medical necessity defense if criminally prosecuted in the future. I respectfully believe that this turns applicable federal criminal procedure on its head. The viability and applicability of this affirmative defense is a mixed question of law and fact. *Arellano-Rivera*, 244 F.3d at 1125. In a criminal prosecution of Raich for possession and use of marijuana for medicinal purposes, if it ever occurs, the issue of the sufficiency of the evidence to submit this particular defense to a jury is a question of law for the federal trial court. *Id.* The establishment of the factual elements of the defense, if submitted, is for the jury (or other trier of fact). *Id.* Imposition of this court's rulings into a later prosecution would improperly pretermit established criminal procedure. Thus, the court's medical necessity discussion is a wholly speculative and possibly unconstitutional jurisprudential exercise.

### CONCLUSION

Accordingly, for the above-stated reasons, I dissent from portions of the court's factual findings and legal conclusions

but concur in the denial of Raich's request for injunction and in the court's affirmance of the district court.